# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ———————————————————— ) | |
| ) | |
| **RÜMEYSA ÖZTÜRK,** ) | |
| ) | |
| **Petitioner** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **DONALD J. TRUMP, in his official capacity** ) | |
| **as President of the United States; PATRICIA** ) | |
| **HYDE, in her official capacity as the New** ) | |
| **England Field Office Director for U.S.** ) | **Case No. 25-cv-12334-DJC** |
| **Immigration and Customs Enforcement;** ) | |
| **MICHAEL KROL, in his official capacity as** ) | |
| **HSI New England Special Agent in Charge,** ) | |
| **U.S. Immigration and Customs Enforcement;** ) | |
| **TODD LYONS, in his official capacity as** ) | |
| **Acting Director, U.S. Immigration and** ) | |
| **Customs Enforcement; KRISTI NOEM, in her** ) | |
| **official capacity as Secretary of the United** ) | |
| **States Department of Homeland Security; and** ) | |
| **MARCO RUBIO, in his official capacity as** ) | |
| **Secretary of State,** ) | |
| ) | |
| **Respondents.** ) | |
| ———————————————————— ) | |

## MEMORANDUM AND ORDER

**CASPER, C.J.**                                          **December 8, 2025**

## I.    Introduction

Petitioner Rümeysa Öztürk ("Öztürk") initiated this action by filing a habeas petition under

28 U.S.C. § 2241 against four United States government officials, D. 1, and subsequently filed an

amended pleading of a combined complaint and petition for writ of habeas corpus (the "Petition

and Complaint"), D. 12, naming two additional Respondents (collectively, the "government").

This Court transferred this matter to the District of Vermont for consideration of the habeas relief

sought in the Petition and Complaint, D. 42.  Öztürk subsequently moved for injunctive relief

there, seeking an order requiring the government to reactivate her Student and Exchange Visitor Information System ("SEVIS") record.  D. 145 at 1-2.  The District of Vermont  determined that venue was improper there as to the SEVIS claims and, accordingly, severed those claims from the habeas relief sought in the Petition and Complaint and transferred that portion of the case back to this Court.  D. 158 at 22, 27; D. 179 at 8-9.  Öztürk has now moved for injunctive relief as to her SEVIS record in this Court.  D. 171.  For the reasons articulated below, the Court ALLOWS the motion.

## II.    Legal Background

### A.    "F-1" Nonimmigrant Visa

The Immigration and Nationality Act ("INA") defines numerous "classes of nonimmigrant aliens," 8 U.S.C. § 1101(a)(15), and provides for the issuance of visas to members of those classes, id. § 1201(a)(1)(B).  The statute defines one such nonimmigrant as "an alien having a residence in a foreign country . . . , who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study" at an approved institution.  Id. § 1101(a)(15)(F)(i).  A visa issued to a nonimmigrant for admission to the United States pursuant to this subsection is colloquially referred to as an "F-1" visa.  See 22 C.F.R. § 41.12.

The State Department "oversees the visa process abroad through its consular officers who determine visa eligibility."  9 FAM 102.2-2; see 8 U.S.C. § 1104.[1]  Once a consular officer issues

---

[1] Citations to "FAM" refer to the Department of State Foreign Affairs Manual.  Foreign Affairs Manual: Public, U.S. Dep't of State, https://fam.state.gov/ (last visited Dec. 8, 2025).  "The FAM 'lack[s] the force of law,' but 'the court may rely on the Manual as one persuasive tool in reading the relevant statutes and regulations and in ascertaining the function of' relevant government actions."  Vyas v. Noem, No. 25-cv-0261, 2025 WL 1351537, at *1 n.1 (S.D.W. Va. May 8, 2025) (alteration in original) (quoting Rajabi v. Rubio, No. 24-cv-494, 2025 WL 1266961, at *2 n.3 (W.D. Va. May 1, 2025)).

an F-1 visa, "notification of such issuance must be entered into the SEVIS database." 22 C.F.R. § 41.61(d). Consular officers and the Secretary of State have discretion to revoke visas, 8 U.S.C. § 1201(i), and immigration officers have limited authority for same, 22 C.F.R. § 41.122(e).

A visa does not guarantee admission into the United States. Rather, "[h]aving a U.S. government-issued visa allows the visa holder to travel to a U.S. port of entry, airport, or land border crossing, and request permission of the Department of Homeland Security (DHS), Customs and Border Protection (CBP) inspector to enter." 9 FAM 102.1-1, 401.1-2(a). A nonimmigrant's "admission" into the country is "for such time and under such conditions as [DHS] may by regulations prescribe." 8 U.S.C. § 1184(a)(1); see 9 FAM 401.1-2(a) (explaining that "CBP will decide if" a nonimmigrant visa holder "may be admitted and for how long the individual may remain in the United States in nonimmigrant status").[2] When an F-1 visa holder attempts to enter the United States to begin study at a university, she may be admitted if (1) she presents a "Form I-20" issued to her by her school via SEVIS, (2) she has appropriate evidence of financial support and (3) she intends to attend the school listed in the F-1 visa. 8 C.F.R. § 214.2(f)(1).

**B.     F-1 Status**

"The period of validity of a nonimmigrant visa is the period during which the alien may use it in making application for admission. The period of visa validity has no relation to the period of time the immigration authorities at a port of entry may authorize the alien to stay in the United States." 22 C.F.R. § 41.112(a). Rather, "[w]hether a student maintains their F-1 status is entirely separate from whether a student obtains or holds an F-1 visa." Parra Rodriguez v. Noem, No. 25-cv-616 (SRU), 2025 WL 1284722, at *4 (D. Conn. May 1, 2025); Doe v. Noem, 783 F. Supp. 3d

---

[2] Although the INA refers to the Attorney General, the "Homeland Security Act of 2002 . . . transferred the immigration powers previously exercised by the Attorney General to the Secretary of Homeland Security and divisions of DHS." Jimenez v. Cronen, 317 F. Supp. 3d 626, 639 n.3 (D. Mass. 2018); see Pub. L. No. 107-296, 116 Stat. 2135.

907, 916 (W.D. Va. 2025) (noting that "once a student is lawfully present in the United States, their F-1 status is not dependent on their F-1 visa"). An F-1 student may remain in the country for their "[d]uration of status," i.e., as relevant here, "the time during which an F-1 student is pursuing a full course of study at an [approved] educational institution." 8 C.F.R. § 214.2(f)(5)(i). A "student is considered to be maintaining status if the student is making normal progress toward completing a course of study." Id. A "failure to maintain status" can also result from engaging in unauthorized employment, providing false information to DHS or being convicted of a violent crime for which a sentence of more than one year of imprisonment may be imposed. Id. § 214.1(e)-(g). A student's status may be terminated, including "by the revocation of a waiver [of inadmissibility] authorized on his or her behalf under [8 U.S.C. § 1182(d)(3) or (4)]; by the introduction of a private bill to confer permanent resident status on such alien; or, pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons." Id. § 214.1(d).

While an F-1 student who completes her course of study is authorized to stay in the country for sixty days to prepare for departure, "an F-1 student who . . . fails to maintain status is not eligible for an additional period for departure." Id. § 214.2(f)(5)(iv). A student who loses F-1 status may seek reinstatement, which U.S. Citizenship and Immigration Services ("USCIS") "may consider granting" if certain requirements are met. Id. § 214.2(f)(16)(i). That decision, which SEVIS is updated to reflect, is not appealable. Id. § 214.2(f)(16)(ii).

C.    **SEVIS**

SEVIS was created as a result of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546, 3009-704 (codified as amended at 8 U.S.C. § 1372). Today, the head of Immigration and Customs Enforcement ("ICE") is "responsible for administering" SEVIS "to collect information relating to nonimmigrant

foreign students" and "use such information to carry out the enforcement functions of" ICE.  6 U.S.C. § 252(a)(4).  ICE runs SEVIS through the Student and Exchange Visitor Program ("SEVP").  See Liu v. Noem, 780 F. Supp. 3d 386, 394 (D.N.H. 2025); 9 FAM 402.5-4(A)(a).

Universities use SEVIS to become certified for F-1 student attendance.  8 C.F.R. § 214.3(a)(1).  An institution that accepts F-1 students is obligated "to report . . . termination of attendance of each nonimmigrant student" or else lose its certification.  See 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.3(g)(1)-(2).  Participating institutions must maintain certain records of F-1 students, and a designated school official ("DSO") must make records available and furnish them to DHS upon request.  8 C.F.R. § 214.3(g).  Schools must also use SEVIS to issue Form I-20 to individuals seeking a new F-1 visa.  Id. § 214.2(f)(1)(iii).

"SEVIS enables SEVP to assure proper reporting and record keeping by schools and exchange visitor programs, thereby ensuring data currency and integrity.  SEVIS also provides a mechanism for student and exchange visitor status violators to be identified so that appropriate enforcement action is taken (i.e., denial of admission, denial of benefits or removal from the United States)."   Student and Exchange Visitor Program, ICE, https://www.ice.gov/sevis [https://perma.cc/5V99-S7BP] (last visited Dec. 8, 2025).  Per the State Department, SEVIS "is designed to monitor the academic progress, movement, etc. of foreign students and exchange visitors from entry into the United States to departure."  9 FAM 402.5-4(A)(a).  Moreover, "the SEVIS record is the definitive record of student or exchange visitor status and visa eligibility."  9 FAM 402.5-4(B)(a).

ICE policy guidance issued to DSOs in 2010 stated that for students present in the United States and in status, "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record."  ICE, Policy Guidance 1004-04 – Visa Revocations 3 (June 7, 2010),

https://www.ice.gov/doclib/sevis/pdf/visa_revocations_1004_04.pdf    [https://perma.cc/ZM2S-R6Z6].[3]  On April 26, 2025, one month after Öztürk's SEVIS record was terminated, see D. 12-1 at 2, ICE issued a "broadcast message" to SEVP personnel that included immediately effective visa revocation as a reason for SEVP to terminate a student's SEVIS record.  D. 148-1 at 2-3.

### III.    Factual and Procedural Background

The Court draws the following facts from the Petition and Complaint and reply in support thereof, D. 12; D. 26, Öztürk's present motion and supporting materials, D. 171; D. 172; D. 173; D. 174; D. 175; D. 176, D. 182, and the government's response to the Petition and Complaint, D. 19, and opposition to the present motion, D. 179.

### A.    Öztürk's Visa Revocation and Initial Arrest and Detention

Öztürk, a Turkish national and doctoral candidate at Tufts University, re-entered the United States pursuant to a validly issued F-1 student visa on approximately June 28, 2024.  See D. 12 ¶ 8; D. 12-2 at 2.  Öztürk's doctoral program began in February 2021, D. 175-4 at 2, and her SEVIS record initially became active on February 16, 2021, D. 175-1 at 2.  On March 21, 2025, Öztürk's visa was revoked, D. 19 at 3; D. 12-2 at 2, subjecting her to removal from the United States as an alien "whose nonimmigrant visa . . . has been revoked under [8 U.S.C. §] 1201(i)," 8 U.S.C. § 1227(a)(1)(B).

Öztürk was given no notice of the revocation of her student visa or student status.  D. 12 ¶ 4.  Öztürk was one of several authors who contributed to an editorial back on March 26, 2024, in the school newspaper, The Tufts Daily, criticizing the University's dismissal of several resolutions that had been adopted by the undergraduate student Senate in "a sincere effort to hold

---

[3] As of the date of this decision, ICE had apparently removed the 2010 guidance from its website.  The Court cites the permanent link cited by the Southern District of West Virginia in Vyas, 2025 WL 1351537, at *2.

Israel accountable for clear violations of international law."[4]  D. 12 ¶¶ 2, 16; D. 26 at 2; D. 26-9 at 67 ¶ 5.

On March 25, 2025, at approximately 5:25 p.m., Öztürk was arrested and taken into custody by ICE agents near her residence in Somerville, Massachusetts.  D. 19-1 ¶ 5; D. 12 ¶¶ 1, 19-20.  A video of Öztürk's arrest shows a hooded officer in plainclothes approach Öztürk and grab her by the wrists.  D. 12 ¶¶ 19-20, 19 n.4.  Five additional officers surrounded her, took her cell phone, placed her in handcuffs and took her away in an unmarked vehicle.  Id. ¶¶ 1, 20.  After Öztürk was in custody, the government served her with a Notice to Appear ("NTA") before an immigration judge in Louisiana for removal proceedings.  Id. ¶¶ 35-37; D. 19-1 ¶¶ 13-15; D. 12-2 at 2.  Following a series of events more thoroughly chronicled in the Court's transfer order, D. 42 at 3-6, Öztürk was detained in ICE custody at the South Louisiana Correctional Facility in Basile, Louisiana.  D. 19-1 ¶ 19.

## B.    Termination of Öztürk's SEVIS Record

Approximately two hours after Öztürk's arrest, a DHS official terminated her SEVIS record for the stated reason, "OTHERWISE FAILING TO MAINTAIN STATUS – Pursuant to Section 221(i) of the Immigration and Nationality Act, 8 U.S.C [sic] 1201(i)."  D. 175 ¶¶ 3, 7; D. 175-1 at 2; D. 175-2 at 2.

On the morning of March 26, 2025, the Principal DSO for Tufts was copied on a SEVP notice to Öztürk, dated March 25, which stated that Öztürk's SEVIS designation had been "[t]erminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the [INA]."  D. 175 ¶ 11; D.

---

[4] According to a supplemental submission Öztürk made to the District of Vermont, the Bureau of Consular Affairs approved the immediate, "silent" revocation of Öztürk's visa "in response to a request from DHS/ICE and the assessment from DHS/ICE" related to the op-ed. D. 91-1 at 6.

175-5 at 2; see D. 12 ¶ 33; D. 12-1 at 2.[5]  The notice warned Öztürk (who, at that point, was already detained in ICE custody) that if she stayed in the United States, she "may be contacted by immigration officials or placed in removal proceedings."  D. 175 ¶ 11; D. 175-5 at 2.  The termination reason in SEVIS was later changed to, "OTHERWISE FAILING TO MAINTAIN STATUS" with further details removed.  D. 175 ¶ 8; D. 175-3 at 2; see D. 175-1 at 2.  On April 8, 2025, the termination reason was again altered, this time to, "OTHER – Individual identified in criminal records check and/or has had their VISA revoked.  SEVIS record has been terminated." D. 175 ¶ 9; D. 175-4 at 2; see D. 175-1 at 2.

Since Öztürk's SEVIS record was terminated in March 2025, she has "lost many research and teaching opportunities, along with a significant amount of time, conferences, and other educational opportunities."  D. 173 ¶ 11; see D. 174 ¶¶ 8-11.  She is currently unable to participate in a specific, paid research assistantship under her academic advisor, and Öztürk and her advisor both attest that they would seek to have her work on the project if her SEVIS record was reactivated.  D. 173 ¶ 14; D. 174 ¶¶ 5-6, 10, 12.  Öztürk attests that prior to the termination of her SEVIS record, she had not received any waiver of inadmissibility or had one revoked, that no private bill had been introduced on her behalf to confer permanent resident status and that no notice had been published in the Federal Register revoking her student status.  D. 173 ¶ 13.

---

[5] The first provision addresses a nonimmigrant's failure to maintain status.  8 U.S.C. § 1227(a)(1)(C)(i).  In other cases involving non-citizens who expressed support for Palestine, the government has invoked the second provision it cited in its letter to Öztürk, 8 U.S.C. § 1227(a)(4)(C)(i), which provides that "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."  D. 12 ¶ 50; D. 12-1 at 2; see, e.g., Khalil v. Joyce, 771 F. Supp. 3d 268, 272 (S.D.N.Y. 2025).  Before the District of Vermont, the government took the position that this explanation is a "data entry into a DHS information system [that] is not a State Department record, and does not speak for the State Department."  D. 83 at 21 n.5.

### C.    Proceedings in the District of Vermont

On April 4, 2025, after a hearing, this Court concluded that it lacked jurisdiction to grant Öztürk habeas relief and, accordingly, transferred this matter to the District of Vermont pursuant to 28 U.S.C. § 1631.  D. 42 at 23-25; D. 43.

On April 18, 2025, after additional briefing and a hearing, the court in the District of Vermont concluded that it had jurisdiction to consider Öztürk's habeas claims related to her detention and the court ordered her transfer from the Western District of Louisiana to the District of Vermont.  See D. 104 at 72-74.  On May 9, 2025, the district court held a bail hearing and ordered Öztürk's immediate release from ICE custody pending resolution of the Petition and Complaint.  D. 130; see D. 140.

On May 23, 2025, Öztürk moved for a preliminary injunction, seeking restoration of her SEVIS record.  D. 145 at 1-2.  The government opposed the motion, D. 148, and simultaneously moved to dismiss, D. 149, arguing that (1) the request was outside the scope of habeas relief, D. 148 at 7-9; (2) venue was improper in the District of Vermont, id. at 9-10; (3) under the INA, the court lacked jurisdiction to grant the requested relief, see id. at 11-14; (4) the relief was barred by the Privacy Act of 1974, 5 U.S.C. § 552a, id. at 14-17; (5) even if the court could grant relief, it was not warranted because the decision to terminate Öztürk's SEVIS record was rational, id. at 17-18; and (6) Öztürk was not entitled to relief because she had failed to show irreparable harm, id. at 18.

### D.    Severance of SEVIS Claims

Following additional briefing, on August 18, 2025, the court in the District of Vermont determined that venue was improper there as to Öztürk's SEVIS claims and declined to exercise "pendent venue" over same.  D. 158.  The court opined that venue would be proper in the District of Massachusetts, id. at 17-20, and it "peek[ed]" at the government's jurisdictional arguments and

determined this Court likely faced no jurisdictional bar to considering Öztürk's SEVIS claims, id. at 23-27.   Accordingly, the court denied Öztürk's motion, denied the government's motion, severed Öztürk's claims relating to her SEVIS record from her habeas petition and transferred those claims to this Court pursuant to 28 U.S.C. § 1406(a).  Id. at 2.

On October 17, 2025, Öztürk filed her motion for injunctive relief in this Court.  D. 171. The Court heard the parties on the pending motion and took the matter under advisement.  D. 184.

## IV.    Standard of Review

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  In deciding whether to grant a preliminary injunction, the Court must assess "(1) the [movant]'s likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the [nonmovant] less than denying an injunction would burden the [movant]; and (4) the effect, if any, on the public interest."  González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009) (quoting Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008)).  When the government is the nonmovant, the third and fourth factors merge.  Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021).   "The sine qua non of th[e] four-part inquiry" governing all motions for preliminary injunctions remains the first factor:  "likelihood of success on the merits."  New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

## V.    Discussion

Öztürk contends that she is entitled to a preliminary injunction because (1) she is likely to succeed on the merits of her claims that the termination of her SEVIS record violated the Administrative Procedure Act ("APA") and First Amendment, D. 172 at 10-14; (2) she faces irreparable harm stemming from the ongoing failure to reactivate the record, including inability to

work and fully engage with her doctoral program and ongoing immigration consequences, id. at 15-17; and (3) the balance of equities and public interest favor issuing an injunction, id. at 18-20.

A.    **Likelihood of Success on the Merits**[6]

1.    *Termination of Öztürk's SEVIS Record Is Reviewable*

As a threshold matter, the government contends that this Court cannot review the termination of Öztürk's SEVIS record.  D. 179 at 9-16.  First, the government argues that 8 U.S.C. § 1252(b)(9) deprives the Court of jurisdiction to review termination of Öztürk's SEVIS record because it "was an action taken in contemplation of the fact that she was removable—and removal proceedings have in fact commenced."  Id. at 9-13.  Second, the government argues that this Court cannot review the termination because it was not a final agency action.  Id. at 13.  Finally, the government argues that the APA's waiver of sovereign immunity does not apply here because the Privacy Act separately precludes Öztürk from seeking relief.  Id. at 13-16.

a)    The INA Does Not Deprive the Court of Jurisdiction

Section 1252(b)(9) channels review of "all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States" to review of a final removal order.  8 U.S.C. § 1252(b)(9).  The First Circuit has explained that this "proviso was designed to consolidate and channel review of all legal and factual questions that arise from the removal of an alien into the administrative process, with judicial review of those decisions vested exclusively in the courts of appeals."  Aguilar v. U.S. ICE Div. of DHS, 510 F.3d 1, 9 (1st Cir. 2007) (emphasis in original).  While the court characterized the channeling requirement as

---

[6] Before the District of Vermont, the government argued that Öztürk's SEVIS claims were outside the scope of habeas relief.  D. 148 at 7-9.  The government has not made the same argument here, and the Court already determined that it lacked jurisdiction to award the habeas relief sought in the Petition and Complaint.  D. 42.  Setting aside the government's "jurisdictional" challenges addressed below, it is undisputed that the Court here has subject matter jurisdiction over the civil, non-habeas claims by Öztürk against the government.

"breathtaking[ly]" expansive, id., it simultaneously recognized that the requirement does not apply to "claims that are independent of, or wholly collateral to, the removal process," including "claims that cannot effectively be handled through the available administrative process," id. at 11. The Supreme Court has since observed that the provision uses "targeted language" and explained that the requirement is not implicated where a party does not seek review of (1) a removal order, (2) the decision to seek removal or (3) the process by which removability will be determined. DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 19 (2020) (citing Jennings v. Rodriguez, 583 U.S. 281, 294-95 (plurality opinion)).

Here, the government argues that the channeling requirement precludes review of Öztürk's SEVIS claims because the termination "flowed directly from the visa revocation and resulted in the initiation of removal proceedings." D. 179 at 12. The channeling requirement, however, "cannot be read to swallow all claims that might somehow touch upon, or be traced to, the government's efforts to remove an alien." See Aguilar, 510 F.3d at 10. The statutory and constitutional challenges Öztürk raises to her SEVIS termination are distinct from a challenge to the government's decision to seek removal or the process of determining removability. See, e.g., Ahmed v. Noem, No. 25-cv-1351 (RBW), 2025 WL 2299447, at *11-14 (D.D.C. Aug. 8, 2025) (concluding § 1252(b)(9) did not strip jurisdiction for a challenge to the termination of plaintiff's SEVIS record even where visa revocation was purportedly immediate and removal proceedings had begun).

Moreover, that Öztürk cannot apparently obtain the relief she seeks through the administrative process also counsels against applicability of the channeling requirement. See Aguilar, 510 F.3d at 11-12; D. 182 at 2-3. Indeed, other courts have observed that "because neither immigration judges nor the [Board of Immigration Appeals] have authority to review SEVIS

12

terminations or reinstatement requests, there is no 'mechanism to review the propriety' of the original termination." <u>Roe v. Noem</u>, No. 25-40-BU-DLC, 2025 WL 1382930, at *5 (D. Mont. May 13, 2025) (quoting <u>Doe v. Noem</u>, 778 F. Supp. 3d 1151, 1159 (W.D. Wash. 2025)), <u>appeal docketed</u>, No. 25-4344 (9th Cir. July 15, 2025). The government's suggestion that Öztürk "can defend herself from the charges of deportability by raising her claims during the administrative removal process and . . . a petition for review," D. 179 at 12-13, conflates her SEVIS challenge with one to removability.[7] Accordingly, § 1252(b)(9) does not prevent review of Öztürk's claims.

b)    <u>Termination of the SEVIS Record Was Final Agency Action</u>

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. To be "final," agency action must (1) mark the consummation of the agency's decision-making process and (2) be one by which rights or obligations have been determined or from which legal consequences will flow. <u>Harper v. Werfel</u>, 118 F.4th 100, 116 (1st Cir. 2024) (citing <u>Bennett v. Spear</u>, 520 U.S. 154, 177-78 (1997)). The government argues that termination of Öztürk's SEVIS record was not a final agency action because it was "one step in the process" of Öztürk's potential removal. <u>See</u> D. 179 at 13.

According to DHS: "When an F-1/M-1 SEVIS record is terminated, the following happens: [(1)] Student loses all on- and/or off-campus employment authorization[; (2)] Student cannot re-enter the United States on the terminated SEVIS record[; (3) ICE] agents may investigate to confirm the departure of the student[; and (4)] Any associated F-2 or M-2 dependent records are terminated." <u>SEVIS Help Hub: Terminate a Student</u>, DHS: Study in the States (May 19, 2025),

---

[7] Although the government suggested at oral argument that Öztürk's SEVIS record could be reactivated if she received a favorable decision in removal proceedings because the current reason listed in the SEVIS record to explain the termination would no longer exist, the government could not point to any legal authority upon which an immigration judge could rely to order such reinstatement.

https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/ter

minate-a-student [https://perma.cc/V7VA-B348].[8]  These impacts are immediate and, as noted,

there is no apparent mechanism for review of the termination's propriety.  This Court, like others,

is satisfied at this stage that the record termination was "a unilateral determination with immediate

legal consequences over which [Öztürk has] no ability to seek administrative review."  Doe 1 v.

Bondi, 785 F. Supp. 3d 1268, 1282 (N.D. Ga. 2025);  see, e.g., Mohammed H. v. Trump, 786 F.

Supp. 3d 1149, 1159 (D. Minn. 2025), appeal docketed, No. 25-2516 (8th Cir. July 31, 2025); Doe

#1 v. Trump, 785 F. Supp. 3d 575, 585 (D. Ariz. 2025); Doe 4, 783 F. Supp. 3d at 1291; Doe #1

v. Noem, No. 25-cv-317-WMC, 2025 WL 1555382, at *9-10 (W.D. Wis. June 2, 2025).[9]

c)    The Privacy Act Does Not Bar Judicial Review

The Privacy Act "contains a comprehensive and detailed set of requirements for the

management of confidential records held by Executive Branch agencies."  FAA v. Cooper, 566

U.S. 284, 287 (2012).  In some circumstances, a citizen or lawful permanent resident can obtain

relief in court for violations that impact records pertaining to her.  See 5 U.S.C. § 552a(a)(2), (g).[10]

---

[8] DHS revised this page after Öztürk's SEVIS record termination, but this list is unchanged. See Doe 4 v. Lyons, 783 F. Supp. 3d 1281, 1296 & n.12 (W.D. Wash. 2025).

[9] The government's cited cases do not compel a different result.  In A.Z. v. Nielson, No. 18-cv-10511-PBS, 2018 WL 5269990 (D. Mass. Oct. 23, 2018), another session of this Court concluded that USCIS's designation of the plaintiff as a "no show" at an asylum interview was not final agency action because this "automatically triggers another round of decisionmaking when USCIS provides 45 days to offer good cause for her failure to appear and then even another round when USCIS refers the case to immigration court."  Id. at *5.  In Dubey v. DHS, 154 F.4th 534 (7th Cir. 2025), the plaintiffs challenged administrative "findings [that] led to the revocation of their visas, which led to . . . removal orders."  Id. at 536.  Neither situation is present here, where there is no automatic review of Öztürk's SEVIS termination and the Court has already rejected the argument that the termination is intertwined with removal proceedings.

[10] The Judicial Redress Act of 2015 extended a limited Privacy Act cause of action to citizens of certain other countries, designated by the Attorney General, that are not relevant here. See Pub. L. No. 114-126, 130 Stat. 282 (codified at 5 U.S.C. § 552a note); Judicial Redress Act of

14

The government argues that because the APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit . . . forbids the relief which is sought," id. § 702, and amendment of Öztürk's SEVIS record is "relief provided by the Privacy Act," which bars claims by non-citizens like Öztürk, judicial review is unavailable here.  See D. 179 at 13-16.

The exception to the APA's waiver of sovereign immunity is not implicated here, at least because contrary to the government's argument, the Privacy Act does not provide the relief Öztürk seeks.  The Privacy Act merely affords a mechanism to ensure that agency records accurately reflect agency decisions, not a means to challenge those decisions.  See Douglas v. Agric. Stabilization & Conservation Serv., 33 F.3d 784, 785 (7th Cir. 1994) (concluding that "the Privacy Act does not permit a court to alter documents that accurately reflect an administrative action, no matter how contestable the conclusion may be"); Reinbold v. Evers, 187 F.3d 348, 360-61 (4th Cir. 1999) (similar).  This Court is persuaded by the reasoning of other courts that have rejected the government's argument, recognizing that a challenge to an allegedly wrongful SEVIS termination "substantively challenges [an] agency decision[] [and] is properly sought under the APA."  Doe #1 v. Noem, 781 F. Supp. 3d 246, 263-65 (D.N.J. 2025) (collecting cases), appeal docketed, No. 25-2260 (3d Cir. July 10, 2025); see, e.g., Liu, 780 F. Supp. 3d at 400 (noting that "[plaintiff's] claim, which challenges DHS's substantive determination, is outside of the Privacy Act's reach"); Parra Rodriguez, 2025 WL 1284722, at *6 (recognizing that plaintiff "[did] not seek to amend her SEVIS record, but rather for [the government] to fully reinstate it with no gaps in status resulting from [the] unlawful termination of it").

---

2015; Attorney General Designations, 84 Fed. Reg. 3493 (Feb. 12, 2019); Judicial Redress Act of 2015; Attorney General Designations, 82 Fed. Reg. 7860 (Jan. 23, 2017).

2.      *Öztürk Is Likely to Prevail on the Merits*

a)      APA Claim

The APA provides that a reviewing court should "hold unlawful and set aside agency action" that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The APA "requires agencies to engage in reasoned decisionmaking."  Regents, 591 U.S. at 16 (internal citation and quotation marks omitted).  A reviewing court must not substitute its own judgment for the agency's but instead assesses "only whether the decision was 'based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  Id. (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).  Agency action does not pass muster where "the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise."  Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).  Öztürk contends that she is likely to prevail on the merits of her APA claim because ICE's termination of her SEVIS record was not in accordance with law and was arbitrary and capricious.  D. 172 at 10-12.

The government's counterargument hinges on the premise that Öztürk "conflates the agency's action here—the termination of her SEVIS record—with the termination of her F-1 status, which has not occurred."  See D. 179 at 17.  The government agrees that the "scenarios in which ICE may terminate a F-1 visa holder's status are not present in this case, but . . . disagree[s] that a SEVIS record cannot be terminated absent these regulatory reasons."  Id. at 18.  The government has advanced this argument to other courts, which have overwhelmingly rejected it.  See, e.g., Doe v. Trump, 784 F. Supp. 3d 1297, 1308 (N.D. Cal. 2025) (collecting cases), appeal docketed, No. 25-4514 (9th Cir. July 22, 2025), injunction modified, No. 25-cv-03140-JSW, 2025

WL 3295383 (N.D. Cal. Nov. 26, 2025); but see Deore v. Sec'y of U.S. DHS, No. 25-cv-11038, 2025 WL 1303954, at *3 (E.D. Mich. Apr. 17, 2025) (denying TRO motion where court had "reservations about whether the two terminations are necessarily linked").[11]    The government argues here that "ICE did not, and has not terminated [Öztürk's] nonimmigrant status, which is reflected by the fact that the NTA does not charge removability under 8 U.S.C. § 1227(a)(1)(C) (failure to maintain status)" but rather "charges removability under [§] 1227(a)(1)(B) based on the State Department's immediate revocation of her nonimmigrant visa." D. 179 at 17.  While it is true that the NTA cites Öztürk's visa revocation as the basis for charging her as removable, see D. 12-2 at 2, the Court is not persuaded this affirmatively evidences anything about her F-1 status.

DHS prior practice confirms that it has treated SEVIS records as reflecting F-1 status, see Jie Fang v. Dir. U.S. ICE, 935 F.3d 172, 177 (3d Cir. 2019) (quoting DHS letter to students stating that "[s]ince your SEVIS record has been [t]erminated you no longer have valid F-1 nonimmigrant status"), although the government has begun to disavow this position this year, see Doe 4, 783 F. Supp. 3d at 1294 (noting that government was "unable to state whether termination of [a] SEVIS record invalidates a student's nonimmigrant status"); Madan B.K. v. Noem, No. 25-cv-419, 2025 WL 1171572, at *8 (W.D. Mich. Apr. 23, 2025) (remarking that government "could not explain, to the Court's satisfaction, how [p]laintiffs with 'terminated' SEVIS records would demonstrate their legal status, if questioned"), appeal of injunction docketed, No. 25-1611 (6th Cir. July 9, 2025).  Assuming arguendo that the government has not terminated Öztürk's F-1 status, Öztürk is

---

[11] The government also notes that "the majority, if not all, of the SEVIS-related cases [Öztürk] cites . . . involved prudential visa revocations that did not render such individuals subject to removal proceedings." D. 179 at 17.  The government does not explain the relevance of this to the Court's analysis.  Moreover, in granting preliminary injunctive relief in this context, courts have confronted immediate visa revocations, see Ahmed, 2025 WL 2299447, at *5, and have separately rejected the government's argument that particular visa revocations were prudential rather than immediate, see Vyas, 2025 WL 1351537, at *5.

nevertheless likely to prevail on her APA argument. The government offers no explanation for the shifting justifications it provided for termination of the SEVIS record, which indicated that her F-1 status was, in fact, terminated. See D. 179 at 17-19; Mohammed H., 786 F. Supp. 3d at 1159 (noting that the government's "reason for terminating [plaintiff's] SEVIS record was a shifting sand, changing weeks after he was detained"). As discussed, for approximately two weeks, the reason provided in SEVIS for Öztürk's record termination was a variation of "OTHERWISE FAILING TO MAINTAIN STATUS." D. 175 ¶¶ 7-9. The termination notice addressed to Öztürk and Tufts the day after her arrest stated that her SEVIS designation was "[t]erminated pursuant to 237(a)(1)(C)(i) and/or 237(a)(4)(C)(i) of the [INA]." D. 175-5 at 2. The first provision makes deportable "[a]ny alien . . . who has failed to maintain the nonimmigrant status in which the alien was admitted . . . or to comply with the conditions of any such status." 8 U.S.C. § 1227(a)(1)(C)(i). The second makes deportable "[a]n alien whose presence in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States." Id. § 1227(a)(4)(C)(i). The government now appears to disclaim these explanations. See D. 179 at 17; D. 83 at 21 n.5.

The termination notice also warned that if Öztürk "remain[ed] in the United States," she could "be contacted by immigration officials or placed in removal proceedings." D. 175-5 at 2. DHS's public guidance on the effects of SEVIS termination advises that Öztürk no longer has any employment authorization due to the termination. SEVIS Help Hub: Terminate a Student, supra; see Doe 4, 783 F. Supp. 3d at 1294 (concluding that "cancellation of employment authorization can only mean that a student has failed to maintain status and therefore is no longer in nonimmigrant status"). Further, the Principal DSO for Tufts attests that because Öztürk's SEVIS record is terminated, the DSO is "unable to provide Ms. Öztürk with documentation of F-1 status."

D. 175 ¶ 12. If Öztürk remains in F-1 status, as the government contends, it is all the more irrational that the government has imposed negative consequences on her that are inconsistent with that status. "Essentially, on one hand, the [g]overnment says [Öztürk] is wrong to conflate the termination of her SEVIS record with the termination of her F-1 status; on the other hand, the [g]overnment itself appears to conflate the two actions and treat [Öztürk] as if she has in fact failed to maintain status." Doe #1, 785 F. Supp. 3d at 585; see Liu, 780 F. Supp. 3d at 402-03 (concluding SEVIS termination likely violated APA where government did not comply with regulatory framework and did not identify any authority that supported lawfulness of termination). The government's suggestion at oral argument that 8 U.S.C. § 1372 provides ICE discretion to terminate a SEVIS record in these circumstances is unpersuasive, as it lacks "any externally imposed limiting principle." See Doe #1, 785 F. Supp. 3d at 585. "Imposing immediate negative consequences on persons while disregarding governing law and regulations is arbitrary and capricious." Kumar v. Noem, No. 25-cv-00042-RGE-WPK, 2025 WL 2887272, at *10 (S.D. Iowa May 15, 2025). To the extent the government relies upon its April 2025 broadcast message to retroactively justify Öztürk's March 2025 SEVIS termination, see D. 179 at 11, "the Court [also] considers [it] arbitrary and capricious" for the government to "justify the[] termination . . . based on a post-hoc application of the new policy." Ahmed, 2025 WL 2299447, at *18 n.20.

Accordingly, because Öztürk is likely to succeed on her claim that the government's termination of her SEVIS record violated the APA, this factor weighs in favor of issuing a preliminary injunction. See Doe #1, 2025 WL 1555382, at *7 (collecting cases).[12]

---

[12] Because of its conclusion that Öztürk is likely to succeed on her APA claim, the Court does not address her First Amendment claim. See, e.g., Liu, 780 F. Supp. 3d at 403 n.7 (resolving APA claim in plaintiff's favor and declining to reach constitutional claim).

### B.    Irreparable Harm

Second, Öztürk must show that she is likely to suffer irreparable harm absent the relief she seeks. Winter, 555 U.S. at 22. Öztürk contends that she has faced and continues to face irreparable harm due to her SEVIS record termination, including because the termination "impede[s] . . . her ability to gain the work and research experiences that are integral to her graduate studies." D. 172 at 16. Öztürk also points to "ongoing immigration consequences" because a gap in her SEVIS record "adds uncertainty to her present situation and will impact her prospects for any future immigration benefits." See id. at 17. The government does not contest Öztürk's argument that she will be irreparably harmed absent relief. See generally D. 179.

A plaintiff may show irreparable harm where she would wrongfully miss out on a "unique, fleeting, one-time opportunity [the plaintiff] has earned" absent relief. Monga v. Nat'l Endowment for Arts, 323 F. Supp. 3d 75, 94-95 (D. Me. 2018). Further, a student whose SEVIS record has been unlawfully terminated may incur unrecoverable "economic losses stemming from [the student's] inability to work as a research assistant or receive [a] stipend." Liu, 780 F. Supp. 3d at 403. Courts have also recognized that SEVIS terminations' interference with on-campus employment authorization disrupts "an integral part of [a student's] doctoral training." Oruganti v. Noem, No. 25-cv-00409-ALM-EPD, 2025 WL 1144560, at *4 (S.D. Ohio Apr. 18, 2025); see Doe, 783 F. Supp. 3d at 927 (explaining that work authorization uncertainty "interfered with [student's] ability to obtain a summer internship, which is an integral component of his graduate program"); Shaik v. Noem, No. 25-cv-1584 (JRT/DJF), 2025 WL 2307619, at *7 (D. Minn. Aug. 11, 2025) (opining that, "even accepting [the government's] distinction between SEVIS termination and termination of F-1 status," consequences of SEVIS termination "would make it impossible for any student to focus on learning or working and contributing to life here in the United States"), appeal docketed, No. 25-2981 (8th Cir. Oct. 7, 2025). Finally, a terminated SEVIS

record may cause a student to "accru[e] unlawful presence" here.  See Oruganti, 2025 WL 1144560, at *4; Ahmed, 2025 WL 2299447, at *19-20.

For all of these reasons, the Court concludes that  Öztürk has made the requisite showing of irreparable harm.  First, she continues to lose out on paid on-campus employment in which she would otherwise be engaged, D. 173 ¶¶ 4, 11, 14; D. 174 ¶ 12, and "there is no dispute that [s]he is neither seeking nor able to recover monetary damages in this case."  Liu, 780 F. Supp. 3d at 403; see Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (recognizing that while economic damages are not typically irreparable because they "can be remedied by compensatory awards," there are "some economic losses [that] can be deemed irreparable"). Second, Öztürk and her advisor attest that Öztürk—who is set to graduate from Tufts in February or May 2026, D. 173 ¶ 3—is losing out on a unique opportunity to work with her advisor on a project that would further her doctoral training and professional development.  D. 173 ¶¶ 7, 9-12; D. 174 ¶¶ 6, 10-12; see Parra Rodriguez, 2025 WL 1284722, at *8 (explaining that "[d]ozens of courts have held termination of a student's SEVIS record . . . constitutes irreparable harm and granted preliminary relief based on that finding").  For at least these reasons, this factor weighs in favor of issuing a preliminary injunction.

### C.    Equities and the Public Interest

Finally, Öztürk must demonstrate "that the balance of equities tips in [her] favor, and that an injunction is in the public interest."  Winter, 555 U.S. at 20.  The analysis of these factors "merge[s] when the [g]overnment is the opposing party."  Does 1-6, 16 F.4th at 37 (second alteration in original) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).  "[T]he public has an important interest in making sure government agencies follow the law," Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin., 407 F. Supp. 2d 323, 343 (D. Mass. 2005), aff'd, 463 F.3d 50 (1st Cir. 2006), and agencies have no countervailing interest in perpetuating unlawful

practices, League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016); Rodriguez v. Robbins, 715 F.3d 1127, 1145-46 (9th Cir. 2013).

The government contends that an injunction is not in the public interest, because of the government's interest in immigration control. See D. 179 at 20. The Court does not question that the government has multiple legitimate interests in the realm of immigration enforcement. See, e.g., Hernandez-Lara v. Lyons, 10 F.4th 19, 32 (1st Cir. 2021) (discussing government interest in prompt execution of removal orders); Landon v. Plasencia, 459 U.S. 21, 34 (1982) (recognizing "government's interest in efficient administration of the immigration laws at the border" and that "control over matters of immigration is a sovereign prerogative"). The government, however, directs the Court to no case recognizing an interest in enforcing immigration policy through unlawful means. Cf. Doe v. Trump, 157 F.4th 36, 79 (1st Cir. 2025) (concluding equity favored petitioner because government faced no irreparable harm if enforcement of unlawful executive order was barred). This Court joins others that have found, in cases involving SEVIS terminations like Öztürk's, that the public interest and balance of equities favor the student. See, e.g., Doe 4, 783 F. Supp. 3d at 1298; Liu, 780 F. Supp. 3d at 404; Doe No. 1 v. Noem, No. 25-cv-1962, 2025 WL 1582460, at *5 (E.D. Pa. June 4, 2025).

## VI.  Injunction Bond

The government requests that the Court require a bond if it issues a preliminary injunction. D. 179 at 20. A "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The purposes of such a bond are (1) to ensure an enjoined party is compensated for costs it incurred due to the injunction if it is later determined the injunction was wrongful and (2) to provide the movant notice of her maximum potential liability for a wrongful injunction. Axia

NetMedia Corp. v. Mass. Tech. Park Corp., 889 F.3d 1, 11 (1st Cir. 2018).   The Court has discretion to dictate the terms of an injunction bond, including declining to require one.  See Pineda v. Skinner Servs., Inc., 22 F.4th 47, 57 (1st Cir. 2021).   The government does not suggest that it will suffer any monetary loss as a result of this Court's injunction.  See D. 179 at 20.  Additionally, "requiring a bond as a condition of obtaining an injunction against unlawful executive action under the circumstances presented here would risk deterring other litigants from pursuing their right to judicial review of unlawful executive action."  League of United Latin Am. Citizens v. Exec. Off. of the President, 780 F. Supp. 3d 135, 225 (D.D.C. 2025).  For these reasons, the Court exercises its discretion to waive the bond requirement.

## VII.    Conclusion

For the reasons stated above, the Court shall grant Öztürk's motion for preliminary injunction, D. 171.[13]  Öztürk shall not be required to post an injunction bond or any other security as a condition of obtaining the injunction described in this Memorandum or the accompanying Order.   An Order of preliminary injunction shall be entered today in accordance with this Memorandum.

So Ordered.

/s Denise J. Casper
Chief United States District Judge

---

[13] While neither party raised this issue, there are (at least) limits on the Court's authority to enjoin President Trump, whom Öztürk named as a respondent.  See D. 12 at 1; see, e.g., González v. Gor, No. 25-cv-1508 (MAJ), 2025 WL 2813829, at *14 (D.P.R. Oct. 3, 2025); Franklin v. Massachusetts, 505 U.S. 788, 802-03 (1992) (plurality opinion); Franklin, 505 U.S. at 826-27 (Scalia, J., concurring).  Because the other respondents can effectuate the relief Öztürk seeks, the Court shall limit the injunction accordingly.